All right, we'll go to the third case on the calendar, United States v. Martinovich. We'll hear from the defendant's lawyer. Good morning, Your Honor. May it please the Court, my name is Larry Woodward. I'm from the Eastern District of Virginia, and I'm here to represent Mr. Jeffrey Martinovich. I have a number of issues that I would like to discuss. I think the one that I would like to start with is probably the one that I think is most problematic in the case, and that is the way in which Judge Dumas interacted with the defense lawyer, the witnesses, and the other folks in this court. I toyed with the idea of starting my argument off by going, stop, stop, stop right now. Mr. Bracaletti, stop. Mr. Bracaletti, are you conducting a discovery in my courtroom? Why didn't you do discovery before the trial? I heard, Your Honor, Judge Winn say you weren't in the courtroom. Well, I understand. I wasn't. I didn't try this case. I've practiced in front of Judge Dumas for 30-plus years, but I think you have to look at the overall way in which the trial was conducted. I mean, I could have filled up the courtroom, the whole transcript, I think, and I would stand corrected. In the defense presentation, it's hard to go more than one page without interruptions from the judge. And the government argues, well, how do you show the prejudice? And I would submit to you that while that's certainly the standard and that's certainly something that you have to look at, but for talking to a juror over the course of a four-week trial where the defense lawyer is constantly berated, the defendant takes the stand, the defendant witnesses. There was one time Judge Dumas assailed a defense witness to the degree that after a break, Mr. Samuels, who was the lead prosecutor in the case, addressed the court and asked him or, I guess, advised the court, if that's the right way to say it, that perhaps that was going too far. So when you have a case of this nature where, like a lot of white-collar cases, the conduct is real. There's not a lot of dispute about what happened. The stock was priced a certain way, certain withdrawals were made, certain pricing was done of the stock. And as in most white-collar fraud cases, it's not a did you find the right person who robbed the bank? It's intent. It's the credibility of the defendant, the reasonableness of what the defendant did as a businessman who was in the investment business. That's what the jury's there to decide, and that's not a simple endeavor in those cases. It's not a DNA where we got the right guy who committed this crime, or is the eyewitness telling the truth, or was the eyewitness high and can't remember what happened. So I would submit to you that I understand, and I'm sure the government will stand up and argue, that there wasn't enough of an objection, it's plain error. I get all that, but a defense lawyer . . . And also, didn't the judge in . . . didn't the court in its instructions to the jury on more than one occasion tell the jury whatever the court may have said or thinks or the court's opinion is not what matters, it's the jury is to focus on the evidence? Yes, Your Honor. He did do that. That's a standard instruction in our district. It's given in every case so far as I know, but that sort of in some ways makes my point, that you stand in there for four weeks, and I know the lawyer that tried this case. He's a very experienced lawyer. I've tried cases with him for a long time, and every time you stand up before you can even make a presentation, it's not like here where you come here and you expect to be interrupted, you expect to be questioned, you expect to be challenged. You've got a jury of laypeople, many of whom probably have never served on a jury before, certainly have never served on a jury of the magnitude and complexity of something like this, and the constant barrage, and you all have the transcript. I put some of it in my brief. You all have the record of trial. I would submit to you that when the United States argues it was even-handed, that is clearly not the case. If you look at that record of trial, Judge, my client took the witness stand to start to, he's a defendant, his whole life's on the line, to start to explain his background, where he went to the Air Force Academy, how he got into his business, five, six questions into it. Mr. Broccoletti, let's talk about something that's important. When are we going to get to this case? Now, I wouldn't say that that happened one time, or I understand that judges are given a broad brush to ask questions, to move evidence along, but if you look at the record of this trial, I mean, it's constant. The defense can't do their job. The defense can't make a presentation because you're constantly being accused of the judge. I counted in there more than a dozen times where the judge tells the defense lawyer he's not talking about something that's important to the case, not in response to an objection from the prosecution, not in response to any, just sua sponte, and to think that after a month of trial, three lines in a jury instruction, and I think Your Honor's right, I think they say it twice. They say it once when they start, you're the judges of the facts, and then at the end in the instructions, you know, you should not speculate about me. To think that that counterbalances what I would say was an anti-defense barrage of questions, admonishments to counsel, and of course what we don't have is the tone of voice and the facial expressions, but just even that, what is one of the main things that a judge tells a jury about judging credibility of witnesses? You may observe their demeanor, their manner of testifying, their way they look on the witness stand. So I would submit to all of you that all that matters too. It's not a judge saying, well, sir, let's move along to another area. Speaking of moving along to another area, do you plan to address the sentencing issue? I do. I'd like to hear about that. Well, and again, Your Honor, I think that goes right into it. Look, I don't think that this court, with regard to the guideline issue, should try to play armchair psychologist about what Judge Dumas said when he said, I know what the Supreme Court says, I know what other courts have said, but in my mind, these guidelines are mandatory. He said it more than once. He said it on multiple occasions. He reiterated it. He certainly went through and calculated a guideline, and the government seems to argue that because he sustained some defense objections to get to a guideline range, that somehow would mean that his words on multiple occasions about that the guidelines are mandatory, that they're mixing apples and oranges. The issue is not properly calculating the guideline. We'll talk about the loss in a minute, but the idea that when you get to whatever guideline you think is appropriate, that you say it's mandatory, and it's not a stray comment. It's not what the government would have you argue. He said, I've considered this. I know what the Supreme Court says. I make a finding they're mandatory. That's not, lots of trial judges lament the guidelines. I don't understand why they did this and how this applies, but this is not an inexperienced judge. He made a finding on the record that the guidelines were mandatory and that, therefore, he had to follow them, and he was going to. He said, I will follow the guidelines, but only because I have to. Yes, ma'am. So I don't know that. Do you need to show that the fact that the judge believed he had to follow the guidelines is mandatory? Do you have to show a substantial impact on the sentence? And can you? Well, I don't know how I could ever show that other than to say he got a guideline sentence. He didn't get the low end of the, he got close to the low end, but not the exact low end, and I would tell the court, again, if you look at the sentencing transcript and the defense presentation, there was substantial material about Mr. McTurnavich's background, his charity, his service in the military. There were letters, people that testified on his behalf. So, again, I think if we get into the idea that we find a judge applied a wrong standard, what would he have done if he applied the right standard is really speculation that we shouldn't have to engage in. What we should have is apply the right standard, understand that the guidelines are one of many, many factors that you should consider, but they're not mandatory. I mean, I've been doing this before there were federal sentencing guidelines. I did it when the guidelines were mandatory, and there was years of litigation to give trial judges discretion to say, okay, you can look at the guidelines, but you don't have to give a guideline sentence. And so I think the impact is the fact that he gave a guideline sentence, he said he had to, and that's what he did. The final thing I'd like to address quickly is the loss issue. I certainly wouldn't profess to the court to have a case that says a privately held security is the same as in the Broda case, which were publicly traded. But what I would say is you can't just presume that there's no value. The government argues, well, Mr. Martinovich's business went bankrupt, and the court kind of adopted the approach that the venture fund had zero value, and therefore the loss should be the entire amount. While it's, you know, we're stuck with the record. You've got to remember the EPV stock, the solar stock, was only one of three investments that were in that fund that people invested in. And when people invested in that fund, they didn't invest in EPV stock. They invested in a hedge fund that held a number of assets. So I don't know if you have something that's subject to market forces, why logically the government argues in their brief that, well, the case law that's out there now and the comments to the guidelines talk about publicly traded assets that are easier to value because you can pick up the newspaper and find out what a willing buyer is paying and what a willing seller is selling it for. The mere fact that it's harder to do or that you have to go through some sort of analysis because the government, if you look at the record in this case, they never said what they thought the stock. Nobody thinks it was worth zero. Nobody thought that EPV was worth zero until we get to sentencing. Then all of a sudden it's not worth anything. You know, there was arguments that people paid $1.15 a share. There was arguments that people paid $0.90 a share. Judge Dumar said in the trial at one point that at $2.13 a share he didn't have a problem with it. But you get to sentencing and all of a sudden it's worth nothing. And even though Mr. Martinovich's business went bankrupt, that doesn't mean that all the stocks and all the assets that are in the investments that he's invested in are all worth zero. So calculating the loss in that fashion, and I realize that there's not a lot of law on it, but I think logically you could say, look, there has to be a market value. It doesn't have to be to the penny. The guidelines in this court's law has said for years that the judge has to make a reasonable estimate of the amount of loss. You don't have to do it to the penny. But just to say, okay, MICG went bankrupt, therefore all of those investments are worth nothing, is not an analysis. It's a cop-out. You know, it clearly is worth something. And one of the – I think Mr. Martinovich should get a new trial, but he certainly should get a new sentencing with a judge that applies the standards that this court and the Supreme Court have held for years. And at that, if he ends up getting convicted or gets back for sentencing, there ought to be an analysis done that says if the stock's not worth what the defense says it's worth, then tell us why, put on evidence, put on something to show that we can just say it's worth zero and whack you for the whole amount on the guidelines. I have 12 seconds left, but I've reserved some time. Thank you, Your Honors. All right. We will hear from the government. Good morning. Good morning. May it please the Court, my name is Katie Dougherty, and I represent the government here from the Eastern District of Virginia. This case comes to you after a four-week trial where the government presented evidence of 28 witnesses, over 250 exhibits, which established that Mr. Martinovich perpetrated a widespread fraud resulting in millions of dollars in loss. I looked at this case and started reading through it and looking at the questions in the transcript here. Something occurred to me and I said, why does it feel like I've seen this before? And you know why it feels like I've seen it before. I don't, Your Honor. Why? Because this same judge was the subject of a case that I wrote two years ago who virtually asked these same kind of questions, and we admonished him, and we said, okay, we're going to go for it, just don't do it again. We had some very senior judges on the panel. Try to be as kind as we could on that circumstance. But it looked like, if you put it aside, the Eklund case and this case, it looks like the same case. And he just kept asking and interfering and doing it, and we said, okay, we'll let this go. And I'm reading this thing and it's the same case. And then I look in the transcript and I see the government has picked up on this. And in the middle of this, when all this is going, the government then asks, this is the trial judge, Judge, given the court's comments and concerns about this witness, the government, of course, has similar concerns. And we were very nice the way you put it, raise it in cross-examination, but I just want to be certain the record is clear. We will raise those issues and we will object to those concerns. I just don't want there to be an issue down the road. The government is picking up on what's going on here. And I'm telling you, this looks really bad to me because I don't get it. I mean, I'm thinking, except being able to speak to a military judge, I was a military judge at once, and we used to ask questions in military trials, and you do it more there because it's more of a fact-finding thing. But this is a troubling case. This is a complicated case dealing with some complicated issues, but the kinds of stuff he tells one witness when the witness gets up and gives his evaluation, and it's really, it's absolutely worthless, isn't it? I mean, that's a comment if I ever heard one in my life. And it's, I mean, I've never seen anything like this. I mean, it's like, it had to have been embarrassing for the government for you to have to listen. I'm not putting the judge down because I want to make sure, I'm not saying we made up our mind on it. But when I read it, I picked this thing up. First thing that came to me, I said, God, I've seen this before. What does this come from? And it turns out it's the same judge in a different case, and I just haven't written an opinion on it. But with that in mind, let me hear your comments. Well, Your Honor, due to the length and complexity of the trial, the judge was called upon to keep the trial on track, to keep witnesses focused, and to admonish counsel of both parties when he thought things were going off the rails. And he took on your role. I mean, he was asking as many questions as the, I mean, there's pages and pages of this. And it's like the government, this is almost like you feel like the government counsel is not competent enough to try this case, so I'm going to make sure I get all the stuff out so that everybody can get it. I understand questions that are allowed, that are there to help to advance the trial. You know what a fair question is from a judge. You know what an unfair question is, too. And that's the point that's kind of bothersome about this. He didn't just do it in one section. This whole transcript has him in this. And he's not only doing that, he's actually admonishing the defense counsel the whole time during the court process here. The trial judge is undeniably active in this case, and he's frequently spoke up to counsel of both parties, admonishing both parties to move it along. I think if you did a search of the phrase move it along in this 5,000-page transcript, it would pop up dozens if not hundreds of times. He wanted us to move it along. And what I think the full record establishes is this judge was an interested, engaged judge, not an obstructionist judge. He was an equal opportunity offender. And most importantly, this case comes to you under plain error review because the trial attorney who represented Mr. Martinovich That came up last time, too, when they said plain error. You know what they said, what the lawyers told them? They said, who's going to interrupt the judge and keep telling him not doing it? That's what they said in the last case. This is plain error. And the guy says, well, judge, we just can't interrupt this judge the way it's going. Well, two things, Your Honor. First is that the federal rule provide a mechanism for counsel to object outside the presence of the jury, so to eliminate any potential embarrassment of objecting to a judge in front of the jury. The second thing is when the government did stand up and raise its concerns about where the cross-examination of or the judge's questioning of defense witness was going, Mr. Brockletty could have jumped right in and said, I agree. He didn't. He did not even chime in at that time. And so over the course of a four-week trial, it's not object once. When it's so bad that the government's counsel got to get up and say it, though. Judge, we're aware of the line of cases from this court, not just Eklund. You saw what was going on in this trial, and you said, whoa, we better do something here. You never know what can happen here, and it was a wise move. And again, I mean, once the government does, why? You don't have to say anything. The government's already told you. And if you get to the point that the government thinks it's error, maybe you ought not get up and say anything. Let it keep on doing it if he wants to have error. But that's an objection in and of itself. I understand the court's concerns. And the government, I don't think, was objecting. We saw where the testimony was going. And we've raised that in response to one particular comment the judge made to this particular defense witness. It was a well-articulated, very gentle way of doing it. I commend you on the way that question was said to the judge. You didn't say it to him directly, but it was as clear the message you were saying as could be made. And I think it made a difference, too. If you look at the way Judge Dumar questioned Michael Umshide after the government brought that to his attention, his questions were more of a benign nature, figuring out what page of an exhibit he was on, clarifying a point. It made a difference. And so by that point in the trial, it was the 34th witness. It was well into the fourth week of trial. The government wanted to let the court know, we understand your misgivings about this particular witness's testimony. We'll address them on a cross-examination. But another thing is really important about this judicial interference argument, and that is that not only the jury instructions three times tell the jury, whatever you think my opinion may be disregarded, the jury did that in this case, and that's evidenced by the mixed verdict they rendered. So we have three accounts on which Mr. Martinovich was acquitted, several on which he was hung, and others on which he was convicted. If the jury had simply adopted what they perceived the judge's view to be of Mr. Martinovich's guilt, they would have convicted across the board. So I think what you have here is a jury that deliberated for over three days, carefully parsed the evidence, winnowed through 25 witnesses on behalf of the government, 10 on behalf of the defendant. They carefully paid attention. They didn't just adopt the court's view whole cloth, and the verdict shouldn't be set aside. So I think their mixed verdicts show they listened to the jury instructions, they listened to the trial, and they weren't overborne by anything the judge may or may not have said. And so I think that Mr. Broccoletti and Mr. Woodward cannot satisfy the standard review on this issue, which is a plain error review, particularly when they didn't object and they didn't join the government's comments to the court. What do we say to the judge this time? The judge told you before, I'm going to tell you again, that's not a good thing to do, but in light of these particular questions, we're going to say there's not prejudice here and move on and wait for a third case to come. Several cases from this judge have been before this court on this issue, and I think reviewing the Carter case, the Gary's case as well, this case actually is not, the judge wasn't as active as in those cases, and in this case he was obstructionist, not obstructionist, he was active on both sides. He interrupted every single government witness and asked substantive questions of 20 government witnesses. So this wasn't just a one-sided thing. He wanted to understand this complex topic. He wanted to understand and follow the testimony. He took copious notes. He was involved in this case but didn't prevent either side from fully presenting their case, and that's another point too. Mr. Martinovich testified for two full days. His witnesses were allowed to testify fully. There's no indication that he was ever cut off, that an exhibit he wanted to introduce was disallowed. He was allowed to put on this case, and so it was a fundamentally fair trial, and we believe that the judicial interference issue is not one that should result in a new trial in this case. I'd like to move on to something Judge Thacker raised with Mr. Woodward about the comments the court made of the sentencing in this case. Undeniably, at the beginning of the three-hour sentencing hearing, Judge Dumar expressed his frustration with the current guidelines regime and remarked that the guidelines were de facto mandatory because if you don't explain the reason you're going outside them, Do you say de facto mandatory? He said, I find them to be mandatory. But then in the next What about this de facto? He said it was mandatory. I need to find that. I just don't remember that. He does say on page 3645 of the joint appendix that I find, the Supreme Court indicates they're advisory. I find they're more than advisory. They're reversible error if you don't follow them. Nothing de facto about that? Not that particular phrase, Your Honor. Within moments of that, he says, I will follow them. Because if I don't follow them, you have to give a lot of reasons why you don't. It's tough. It's really tough. That comment is a misstatement of the law. Full stop. It is. But I don't believe Before that, he says, I will follow the guidelines only because I have to. I find that they're not discretionary. They're mandatory. That is correct, Your Honor. I just, I mean, how do you, couldn't be more clear. Those comments were made in the first four pages of a 115-page sentencing transcript. Right. So it sets the tone. Here we are. These are mandatory, and I'm only going to follow them because I have to. And we would characterize those as the judge's opening prefatory comments about the sentencing guidelines regime before getting down to the business of sentencing in this case. After those initial incorrect comments, when he gets to the actual facts of this case in Mr. Martinovich's sentence, he backs off of that. He references the 3553A factors. He recognizes, after both counsel remind him that they are only advisory, that they're only but one factor to be considered. And the Mendoza case out of this court from 2010 says it's not looking at one stray remark on a list of forbidden phrases. We're not looking at one stray remark. We've rattled off four, I think. That's correct. He did several phrases in a few moments at the beginning of a long sentencing hearing say an incorrect standard of law. But the Mendoza court says we need to look at what he did, not necessarily what he said maybe at the beginning of the sentencing. And here what the judge did over the course of many hours is carefully assess the arguments of the parties, listen to the arguments of counsel about various enhancements, calculate the sentencing guidelines range, and impose a sentence as a matter of judgment, not because he believed he had to. And so I think when you take the entire sentencing transcript, he made an individualized assessment, and he didn't adopt the revised guidelines range as something he had to impose a sentence from. He listened to arguments. He actually did do an individualized assessment. He wasn't just assuming the guidelines to be mandatory. This is a very, very experienced judge who varies regularly, I could say, in my appearances in front of him. He varies up, usually down, quite frequently. There's no reason to think that he forgot the entire modern sentencing regime based on a few comments at the beginning of a lengthy hearing. And those comments are also important because he's talking about the history of the guidelines. He references the Crime Control Act. Senator Strom Thurmond and Ted Kennedy likens the guidelines to a rainbow. He's making some overarching preparatory comments before getting down to the business of sentencing this particular defendant. After those are complete and he listens to arguments of counsel, he makes an individualized assessment and doesn't just adopt the guidelines full out. So we don't believe that the full transcript establishes that he presumed the guidelines to be mandatory or treated them as mandatory in actually handing down a sentence to Mr. Martinovich of 140 months. Those comments, I'll also note, are made at a time where the guidelines range was 262 to 327 months. Over the course of the sentencing, as he ruled on objections and that guidelines range dropped, that sentence, although within that revised guidelines range, he references the 3553A factors for why he's imposing 140 months, not the guidelines itself. I'll move on, finally, to the last issue Mr. Woodward touched upon, which is the loss amount. District Court didn't clearly err in determining the loss attributable to Mr. Martinovich's fraud, and that loss amount is supported by preponderance of the evidence and is a reasonable estimate based on all of the information in front of the District Court. Dura is inapplicable in this case. The loss amount is not the value of EPV and how it fluctuated. It's the amount the investors paid into the Venture Strategies Hedge Fund based on Mr. Martinovich's omissions, representations, and false statements. And so the way the court came up with $1.75 million, which is a large decrease from the $3.7 million loss amount that the pre-sentence report had calculated, the court concluded beyond a reasonable doubt on page 3707 of the joint appendix that the loss was between $1 million and $2.5 million. So he's already saying between these two benchmarks of the sentencing guidelines table, I find it's in that range. Then he included the entirety of the investments made in the Venture Strategies Fund on the basis of the defendant's misrepresentations after the fraud began and a portion of an investment in an MICG bond about which testimony was heard at trial. The judge stated he considered the value of the remaining asset in the fund, the bond investment, the trial testimony, and that $1.75 million is a legitimate, best estimate I could come up on based on everything I had considered, and in fact noted it was the lowest figure of all he figured. The Dura case is simply inapplicable. The market had nothing to do with the loss in this case. The loss is what the investors paid in based on Mr. Martinovich's fraudulent representations and omissions. So the market downturn didn't hurt or didn't impact at all the value of EPV as pertaining to Mr. Martinovich's fraud. At the end of the day, this case comes to you after a four-week trial and a lengthy sentencing hearing where the judge, although an active and engaged judge, did the best he could to manage a complex and lengthy trial and to determine a loss amount after hearing weeks in testimony that is a reasonable best estimate of the loss caused by Mr. Martinovich's fraud. And for these reasons, we think the judgment should be affirmed in all respects. Thank you. You've got a few minutes if you want to use that. Just a couple of points. I find it interesting that the way the United States attorney described Judge Dumar's behavior in this trial is, quote, an equal opportunity offender. I don't think that's true, but even if it is, that's certainly not the standard that I think should be applied or to expect. And I would tell you, Your Honor, this has happened more than one time before. The Garys case, which is an unpublished opinion, was my case. Just like this, someone else, the individual who represented Mr. Garys is now a judge, a state court judge in Virginia. I got appointed to represent Mr. Garys on appeal. The court found that Judge Dumar had overstepped the bounds and they found harmless error in that case. The other cases you're aware of, just like in this case . . . Let's focus on this one. I got appointed after the trial was over, and again, I don't . . . It's just . . . I mean, I know Your Honors have all tried cases as lawyers and judges and everyone else, and there's an art and a skill to advocacy, and what you're looking for is a level playing field, not every time you stand up being berated. I would submit to you . . . You all have the transcript that with all due respect, after that comment was made during the testimony of a defense witness, Mr. Umscheid, my client got on the stand and the judge lit into and questioned and interrupted. I counted them. I put it in the brief almost 300 times, and there was no change. If anything, there was a change for the worse. With regard to the comments, she . . . Ms. Daugherty will say, well, when he says, I find the loss amount to be this and this, you should rely on it, but not when he says, I find the guidelines to be mandatory. So, her view would seem to be that Judge Dumar's understanding of the word I find changed from 10 o'clock in the morning when he was finding the guidelines mandatory to 12 o'clock or 1230 when he was finding the loss. That doesn't make sense. And again, the market clearly affected this loss. The stocks go up and down. They made no effort to make a determination of amount that the fraud that was found affected it, and it was . . . the fund still existed. When the fund . . . the fund's being administered right now, so to just say that every penny somebody put into a stock fund is the amount of loss regardless of the market forces that may have caused the stock fund or the hedge fund to go up and down, while, you know, again, I understand BRODA is not a criminal case, and it's not based on a privately held asset, logic would tell you that if you are doing something that's subject to market forces that are beyond your control, and everyone knows that when they invest money, that certainly if someone commits fraud, they should be held accountable for what you lose through their fraud, but, you know, they should not be held accountable when the entire world economy goes into a recession. And you have to make an effort in being fair to sentencing a citizen to figure out what he did that caused harm and what he's not responsible for. And that's all that we're asking, and that's what I would submit was not done in this case. Thank you, Mr. Blood. Thank you. Are you a court appointed? Yes, sir. Thank you for your services as a court appointed attorney. Certainly we could not do the cases of this magnitude without the services of lawyers like you who volunteer and accept appointments for cases of this type. And always we're happy to have your attorney's office here too. We'll come down, greet counsel, and take a break.
judges: James A. Wynn, Jr., Henry F. Floyd, Stephanie D. Thacker